

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 2, 2023

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    <u>United States v. Jonathan Garcia, a/k/a "Jayo,"</u> 19 Cr. 862 (VEC)

Dear Judge Caproni:

      The defendant in the above-captioned case, Jonathan Garcia, a/k/a "Jayo," is scheduled to be sentenced on November 16, 2023, at 11:00 a.m. for his leadership role in the Latin Kings and for the murder of Joshua Flores.  At trial, a jury convicted the defendant of conspiracy to commit racketeering, conspiracy to distribute controlled substances, brandishing a firearm in furtherance of that drug conspiracy, and murder in aid of racketeering.  The latter count carries a mandatory minimum term of life imprisonment.  For the reasons set forth below, the Government submits that a term of life imprisonment is necessary and appropriate even absent any statutory requirement.

**I.    Offense Conduct**

    **A.  The Latin Kings**

      The Latin Kings are a nationwide street and prison gang formed in the 1950s in Chicago. The Latin Kings are made up of multiple sets, or "Tribes."  In New York, those tribes include the Woodhaven Mayans and the Black Mob.

      The Black Mob was formed in the early 2000s and is sanctioned by the Latin Kings leadership in Chicago.  In 2019, there were approximately 300 members of the Black Mob, most of whom were in the Bronx, though the gang also has a large presence in Queens, Brooklyn, and Long Island.  Members of the Black Mob also associated with other Latin Kings in Connecticut, Massachusetts, and California.

      The Latin Kings in general, and the Black Mob in particular, made money through narcotics sales, gun sales, robberies, and other illegal activity.  Members of the Latin Kings gain status and protect their enterprise by regularly committing acts of violence against rivals.  Members of the Latin Kings are expected to work together to earn money, and they help supply each other with narcotics, narcotics customers, and firearms.  During the relevant period, the gang controlled

multiple drug locations, including trap houses in Brooklyn and Queens, and a valuable block in the vicinity of 148th Street and Willis Avenue in the Bronx. The gang sold large amounts of fentanyl, heroin, cocaine, crack, oxycodone, Xanax, and marijuana. Members contributed a portion of their illegal drug proceeds as membership dues. Members of the gang also had access to firearms, which they used to protect their drug business, rob other drug dealers, and commit violence against rival gang members.

Jonathan Garcia, a/k/a "Jayo," the defendant, joined the Latin Kings in approximately 2012. Garcia was a member of the Queens-based Latin Kings tribe called the "Woodhaven Mayans" until approximately 2018, when he joined the Black Mob tribe after having committed the 2017 murder of another Latin Kings member, Joshua Flores, a/k/a "Monster," described further below. As a member of the Latin Kings, Garcia held multiple leadership positions, including First Crown of the Woodhaven Mayans and a "Coppo" in the Black Mob. He was senior enough in the gang that at one point he was recruited to be the "Prince Crown" of Queens by the then-highest-ranking member of the Latin Kings in New York (the "Inca"), but he did not ultimately accept that position. Garcia had a reputation for violence within the Latin Kings, which he developed over the years by engaging in and ordering acts of violence, including shootings and assaults, against rival gang members. Garcia was also involved in the gang's drug dealing, including by selling significant quantities of marijuana, cocaine, and ecstasy with other gang members and by operating a trap house in Queens, where the gang also kept firearms to protect its drug operation.

### B. The May 18, 2017 Murder of Joshua Flores

On May 18, 2017, the NYPD responded to reports of a male individual having been shot in the vicinity of 94-28 88th Street in Queens, New York, across the street from the 88th Street Park. The victim, who was later identified as Latins Kings member Joshua Flores, was taken to Jamaica Hospital in Queens and was pronounced dead upon arrival at the hospital. The cause of death was a gunshot wound to his back.

Flores's murder stemmed from an intra-Latin Kings dispute between Garcia, who held a leadership position (or "Crown") within the "Woodhaven Mayans" tribe of the Latin Kings at the time of the murder, and members of the Queens-based Latin Kings tribe "Wild Lion City." Sometime before the murder, the Woodhaven Mayans were hosting a Latin Kings barbeque in Queens, at which other Latin King tribes were present. Garcia was involved in an altercation with some of the individuals at the barbecue and Garcia fired a gun in the air. The members of Wild Lion City viewed Garcia's use of the firearm as an act of provocation. After the barbecue, members of Wild Lion City wanted Garcia to be "stripped" (in other words, to kick Garcia out of the gang). Garcia arranged to meet the Wild Lion City members near the 88th Street Park in Queens on May 18, 2017. The 88th Street Park was part of Garcia's tribe's territory, and was adjacent to the trap house from which Garcia ran his drug operation. The Wild Lion City members told Garcia that the purpose of the meeting was to "strip" Garcia of his Latin Kings membership for having discharged the gun at the barbecue.

On May 18, 2017, Garcia went to the 88th Street location with other members of his Tribe, including his cousin. Garcia brought a gun with him to this meeting. Shortly before the meeting, Garcia entered a deli near the 88th Street Park and purchased a pair of black gloves. While paying for the gloves, Garcia told the store owner not to show the police any surveillance video if they

later came looking for it. Garcia hid the gun on the wheel of a parked car next to the park entrance where he had arranged to meet the Wild Lion City members.

Shortly thereafter, Garcia and the Wild Lion City Latin Kings met at the prearranged spot in front of the 88th Street Park, which was near the trap house operated by Garcia and his fellow gang members. Video shows Garcia and the Wild Lion City members appear to speak peacefully for a lengthy period of time—at least ten minutes. At one point, Garcia appears to have said something to the Wild Lion City members that provoked a reaction, and the Wild Lion City members began to chase Garcia down the street. At that point, Garcia's cousin took the gun out of its hiding place and fired a single warning shot in the air. The warning shot sent the Wild Lion City members running away. As the rivals ran for their lives, Garcia then took the gun from his cousin and fired multiple shots at those rivals. One of the bullets hit Joshua Flores in the back of his shoulder as he fled for his life.

After the murder, Garcia had multiple conversations with Jose Casado, who held the "Inca" position in the Latin Kings, which was the highest position in New York State, in which they discussed Garcia's involvement in the murder. Garcia explained to Casado that the dispute started because another Latin Kings member had "com[e] to my barbeque, saying that he's gonna punch one of my tribe members in the face." Garcia also told Casado that, on the night of the murder, he had given the gun to his "cousin," who fired one to two shots in the air, and then Garcia took the gun from his cousin and opened fire on the group of Latin Kings that attempted to "strip" him. Garcia then explained that "the [Black] Mob is the only niggas that respect what happened," and went on to tell Casado, in substance and in part:

> And everything was supposed to be nipped in the bud a week prior to them doing what they wanted to do. And them niggas took it upon themselves, I guess they was drunk or something, I don't know what the fuck. They took it upon themselves to pull up to my jurisdiction, trying to strip me. Y'all niggas must be crazy nigga. I won't even let my own crowns strip me. You think I'm going to let outsiders strip me? First of all, I only knew like about five bros that was there. The rest of them niggas I never seen a day in my life. A day in my life. RIP the bro - I never seen that nigga a day in my life neither. So he had no business being there . . . you know what I'm saying, like, fuck was you doing? Y'all niggas don't even know how I give it up. You feel me?

Garcia then went on to explain that the dispute that led to the murder was all about "control" within the Latin Kings. For example, on June 27, 2017, Garcia made the following statements:

> Niggas can't control me. So you know what, being that we can't control them, what is one lion gonna do against thirty lions? They tried it, they tried it, they tried it. But you know what happened? Them thirty lions went running. Excuse me, twenty-nine of them went running. You understand what I'm saying?

On August 8, 2017, at law enforcement's direction, Casado video-recorded an in-person meeting with Garcia in Battery Park, Manhattan. During that meeting, Casado and Garcia discussed the murder. Garcia indicated that the authorities "gotta prove it" and that without any proof, he was "good." Garcia further indicated that in addition to "proof," the authorities would

need someone "to take the stand." Garcia then posed the following question to Casado: "Who gonna take the stand bro?" Garcia then explained that if someone were to take the stand, they would never be heard from again, "it would be like they died." Garcia also told Casado that after the murder, he gave the gun to an individual known as "Mega" (known to law enforcement as David Golden), who was supposed to take the gun "down south" to sell it. However, Mega sold the gun to an undercover officer in Queens and was arrested.[1]

### C.  Garcia Uses the Murder to Advance in the Gang

In the months that followed, Garcia was recruited to join the Black Mob tribe of the Latin Kings and used the status he had gained from committing the murder to gain entry to the Black Mob. Cooperating witnesses at Garcia's trial explained that the murder gave Garcia power and status within the Latin Kings (and specifically, within the Black Mob). For example, Christopher Nelson, a/k/a "Hype," was sent by the Black Mob's leadership to vet Garcia prior to his joining the Black Mob. During that meeting, which Garcia requested take place at the location of the May 2017 murder (in front of 88th Street Park), Garcia explained his drug operation to Nelson and also described to Nelson his involvement in the murder, even calling Flores "a bitch." Nelson testified that Garcia was brought into the Black Mob in part because of his willingness to engage in violence and because of his profitable drug dealing operation. After joining the Black Mob, Garcia also told Heinner Solis, a/k/a "Juelz," that he had "made that movie" in Queens, referring to the murder of Flores. Moreover, the First Crown of the Black Mob, Carmelo Velez, a/k/a "Jugg," told Casado that the Black Mob needed more members like Garcia, who were willing to engage in violence. Finally, Jupanky Pimentel, a "Don" in the Black Mob, approved of Garcia joining the Black Mob because of Garcia's reputation for violence, which was further solidified after Garcia committed the murder.

In the years after the murder, Garcia repeatedly bragged about his involvement in the murder. For example, one of Garcia's fellow gang members, Fame Kobaine, released a song titled "Heavy On It" that made an explicit reference to Garcia's involvement in the murder, stating "2-3 shots like Jayo." After the song was released, Garcia changed his Instagram profile name to "jayo2three" and regularly referred to the line in the song to brag about his involvement in the murder. For example, Garcia posted a photograph of himself holding two firearms in response to a question from another user that asked, "why they call you two three?" to which Garcia responded, "iykyk" (i.e., if you know, you know). Garcia also posted a video of himself rapping the line about the song referring to the murder and pointing his hands at the camera as if holding a gun.

Moreover, as recently as May 2023, the month before Garcia's trial, Garcia was using a contraband phone in the MDC Brooklyn to communicate with others and to take videos of himself smoking synthetic marijuana in jail. One of the videos even shows Garcia with other individuals flashing Latin Kings gang signs and saying, "two three shots like Jayo," after which Garcia points his hand at the camera as if holding a gun. Based on the communications on that contraband phone, Garcia also appears to have been involved in dealing drugs and/or other contraband in the prison.

---

[1] The Government's ballistics expert at Garcia's trial testified that the firearm purchased from David Golden was the firearm that shot the bullet that killed Flores.

### D. Garcia's Drug Dealing with the Latin Kings

The testimony at the defendant's trial established that the Latin Kings, including the Black Mob tribe, sold massive quantities of narcotics, such as fentanyl, heroin, crack, cocaine, marijuana, oxycodone, Xanax, and ecstasy. The gang operated various trap houses throughout New York City, including in the Bronx, Brooklyn, and Queens, where it kept its drugs and guns.

Garcia personally sold marijuana, cocaine, and ecstasy with the gang, and he supervised other members of the gang who were selling other types of drugs, including fentanyl, heroin, and crack. As a leader in the Black Mob, Garcia supervised the gang's drug operation and at times ordered members of the Black Mob to sell more drugs and open up more drug spots.

Christopher Nelson testified that he supplied Garcia with approximately 20 pounds of marijuana every two weeks for resale, and that he understood that this supply was only a portion of the drugs Garcia was receiving on a regular basis. Nelson also testified that Garcia ran a lucrative drug operation in the vicinity of the 88th Street Park in Queens, which included not only a trap house where they sold every type of drug, but also an extremely profitable delivery operation. Garcia and other members of the gang kept guns at that trap house to protect the drug operation. Nelson also knew Garcia to be selling cocaine. According to Nelson, some of the drugs that Garcia was selling were shipped through the mail.

Solis also testified that he knew Garcia to be selling drugs, including cocaine, and that at one point he discussed supplying Garcia with cocaine.

Videos and photographs on Garcia's social media and iCloud accounts also demonstrated that he was selling significant quantities of drugs, including marijuana and what appeared to be ecstasy pills. During the period of the charged racketeering and narcotics conspiracies, Garcia was also convicted of a felony for possession of cocaine.

Trial testimony also established that the Black Mob was selling (i) approximately 500 grams of fentanyl and heroin per month; (ii) approximately 700 grams of crack per month; (iii) approximately 50 to 100 grams of cocaine per month; and (iv) up to approximately 20 to 25 pounds of marijuana per month. During the course of the FBI's investigation into the Black Mob, law enforcement also seized approximately 220 grams of fentanyl, 258 grams of crack, 60 grams of heroin, and 19 grams of cocaine in connection with purchases of narcotics from members of the gang, all of which is consistent with the above quantities and types of drugs that the gang was selling. As a leader in the Black Mob, Garcia was aware of the type and extent of drugs that his co-conspirators were selling. A conservative estimate of the overall drug weight foreseeable to Garcia, based on his leadership role within the Black Mob from at least approximately June 2017 until the initial takedown in this case in approximately November 2019, would therefore be (i) 15 kilograms of fentanyl; (ii) 15 kilograms of heroin; (iii) 21 kilograms of crack; (iv) 2.25 kilograms of powder cocaine; and (v) 600 pounds of marijuana. These amounts to do not even include the substantial amounts he sold with the Latin Kings prior to joining the Black Mob.

While in jail on the instant offense, Garcia appears to have continued distributing drugs. As discussed above, a contraband phone was seized from his cell in the weeks leading up to trial. This phone contained multiple videos and images of Garcia with large, distribution-size quantities

of marijuana in his cell.  Communications on his phone with individuals outside indicate that Garcia was continuing to coordinate drug sales, with proceeds being deposited into a Cashapp account, which Garcia controlled from his contraband phone.

### E.  Other Acts of Violence Garcia Committed with the Latin Kings

The trial testimony also established that the Latin Kings' violence in general, and Garcia's violence in particular, was not limited to the murder of Joshua Flores.  The Latin Kings were expected to carry weapons, including guns, and members of the gang all had access to guns.  The gang used these guns to protect their drug operation, and also to commit violence against rivals.  Many of these guns were also used in robberies.  Garcia was known to be one of the Latin Kings who had a gun, and Garcia also posted numerous photographs and videos of himself on social media brandishing firearms, including with other Latin Kings.

Christopher Nelson testified that when Garcia joined the Black Mob, Garcia was very vocal at Latin Kings meetings about needing to commit more violence against Wild Lion City, the Latin Kings tribe that attempted to kick Garcia out of the Latin Kings.  Similarly, Jose Casado testified about Garcia's involvement in shooting of rival MS-13 members at a fast-food restaurant in Queens, as well as other acts of violence, such as assaults, that Garcia committed against rival gang members.

### F.  Obstruction of Justice

The Latin Kings in general and the Black Mob in particular have a code that prohibits cooperating with the Government.  As discussed above, Garcia himself referred to this code when discussing the murder with Casado, telling Casado that no one would take the stand against him, because if they did, they would be killed.

While Christopher Nelson was incarcerated at the MDC, which was the same facility Garcia was incarcerated at the time, Nelson was brutally attacked by two inmates who were members of the Bloods gang.  The Bloods members slashed him in the arm, leaving a scar, and punched him in the face.  As the gang members were attacking him, one of them said, in substance and in part, "We'll break your jaw so you can't take the stand against Jayo."  At the time, Nelson's cooperation was publicly known within the gang.

## II.   Procedural History

On October 1, 2021, a grand jury returned a five-count Indictment charging Garcia with (1) conspiracy to commit racketeering, in violation of 18 U.S.C. §§ 1962(d) and 1963 ("Count One"); (2) murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) ("Count Two"); (3) causing the death of another through use of a firearm, in violation of 18 U.S.C. § 924(j) ("Count Three"); (4) conspiring to distribute more than one kilogram of heroin, more than 400 grams of fentanyl, more than five kilograms of cocaine, more than 28 grams of crack, and a quantity of oxycodone, alprazolam, and marijuana, in violation of 21 U.S.C. §§ 846, 841(a), 841(b)(1)(A), 841(b)(1)(C), and 841(b)(1)(D) ("Count Four"); and (5) possessing firearms in connection with a narcotics conspiracy, some of which were brandished and discharged, in violation of 18 U.S.C. § 924(c).

On June 15, 2023, following a jury trial, the defendant was found guilty of Counts One, Two, Four, and Five.[2] With respect to Count Five, the jury found that the defendant possessed and brandished, or aided and abetted the possession and brandishing of, a firearm, but did not find the discharge. The Probation Office has calculated a base offense level of 52. Pursuant to Chapter 5 of the U.S.S.G., however, this is one of the "rare instances" in which the total offense level is in excess of 43, and because the sentencing table does not go past 43, the offense level is treated as 43. The defendant would be in Criminal History Category V, but because he is a career offender, he is in Criminal History Category VI. The resulting Guidelines range is life imprisonment, followed by a mandatory consecutive seven years for Count Five.[3]

The Government agrees with the Probation Office's Guidelines calculation, but has identified two errors with respect to the relevant statutory maximums and minimums. First, because the jury found that the racketeering conspiracy involved a murder and a b(1)(A) narcotics conspiracy, the statutory maximum for Count One is not 20 years, as stated in PSR ¶ 170, but life. Second, with respect to Count Five, because the jury found that firearms possessed in connection with the narcotics conspiracy were possessed and brandished, but did not find that such firearms were discharged, the mandatory minimum for Count Five is not ten years, as stated in PSR ¶ 173, but seven years.

Because Count Two carries a mandatory minimum sentence of life, and because Count Five carries a mandatory minimum consecutive sentence of seven years, by statute the Court must impose a sentence of no less than life imprisonment plus seven years. The Government respectfully submits, however, that even absent any mandatory minimums, a life sentence would be appropriate in this case based on the Section 3553(a) factors addressed further below.

**III.   Discussion**

    **A.   Applicable Law**

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* & n.6. Those factors make a Guidelines sentence of at least 30 years appropriate in this case.

---

[2] Prior to trial, the Government elected not to proceed on Count Three.
[3] With the grouping analysis and applicable mandatory minimums, the Guidelines calculation for each individual count becomes largely academic. We note, however, that even on a standalone basis, the Guidelines range for Count One (the racketeering conspiracy) would be life imprisonment, as would the Guidelines range for Count Four (the narcotics conspiracy).

### B. A Sentence of Life Imprisonment Is Appropriate in This Case

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C). These considerations weigh in favor of a sentence of life imprisonment.

*First*, a life sentence is necessary to reflect the seriousness of the defendant's crimes and the harm he caused the community over the span of several years. The defendant was a leader in one of the city's most violent gangs. Even apart from the murder, he personally committed multiple acts of violence, and he directed and encouraged his subordinates to commit even more. These acts of violence ranged from assaults and beatings to shootings—including shootings involving rival gang members. His reputation for violence helped him rise the ranks of the Latin Kings. He ran his own tribe—the Woodhaven Mayans—and then used his notoriety from the murder to gain entry to the Black Mob, where he served as a leader of the Queens branch. The defendant was so respected within the gang that he was once even offered the position of "Prince Crown" of Queens.

The Latin Kings in general, and the Black Mob in particular, was in many ways a business, with its profits coming from crime. As the Black Mob protocol spelled out, "BM [the Black Mob] is a criminal organization we seek profits in robbery, extortion, dealing drugs, gambling, contracts, prostitution and in all aspects of criminal profits [f]or the advancement of the BM." The gang's drug trafficking operation was probably its most profitable line of business, though the robbery operation was also disturbingly large. The quantities of drugs the gang was dealing were massive, and they included the most dangerous drugs on the market—including heroin laced with fentanyl. Garcia was personally selling drugs himself, and also had junior gang members selling on his behalf. He operated a stash house in Queens where the gang sold every drug imaginable, and he protected that operation with guns. In fact, the trial testimony showed that when the defendant lobbied for admission into the Black Mob, he cited not only his reputation for violence, but also the lucrative drug operation he had built. Once he joined the Black Mob, he pushed for the gang to expand the drug operation and sell even more. It is notable that the Guidelines range for the narcotics conspiracy standing by itself is a term of life imprisonment.

As the Court has recognized at sentencings for other co-defendants in this case, the Black Mob's drug operation was far more dangerous than that of the average drug operation, precisely because this drug organization was a gang. This gang was a criminal enterprise of more than 300 members that pooled its resources—and its capacity for violence—to sell drugs all over the greater New York area. The drugs funded the gang's guns and violence, and the guns and violence in turn protected the gang's drug operation. This conduct imposed harm not only on the addicts who purchased the Black Mob's drugs, and not only on the victims of the Black Mob's violence, but also on the young men—some as young as sixteen—who were recruited in the gang and viewed leaders like the defendant as a role model.

The defendant's stature in the gang, and the reason he was admired, was in large part due to his murdering Joshua Flores. In a gang that was notorious for violence, the defendant stood apart, because he was a Latin King who had actually committed a murder. Indeed, as described further below, it is particularly noteworthy that, of all the other high-ranking Latin Kings co-

defendants who have been sentenced to lengthy prison terms by the Court, the defendant is the only one who has been convicted of murder. That aggravating fact alone is sufficient to warrant a sentence that far exceeds any of the other sentenced imposed in this case. Moreover, the murder was entirely avoidable. The defendant chose to confront his rivals that night. He chose to go armed with a gun and with backup. He bought a pair of gloves so that he would not leave fingerprints, and he told the cashier not to show the footage to the police. He shot Flores in the back, as Flores was running for his life. And then he bragged about the murder—repeatedly, and for years—and about how anyone who would dare testify against him would end up dead. His fellow gang members rapped about the murder. He boasted about it on social media, including by posting photographs of himself with guns and the reference to the "2-3 shots like Jayo" line. Put simply, he has never shown a moment of regret for taking Flores's life and instead, has bragged about it for years. The defendant showed—and continues to show—a complete indifference to human life when he murdered Flores. A respect for the value of Flores's basic human dignity demands a sentence of life imprisonment.

*Second*, an above-Guidelines sentence is necessary to deter the defendant from committing more crimes, and to deter others from following in his path. The defendant is relatively young but already has several serious convictions involving drugs and violence. At age sixteen, the defendant was convicted of two separate robberies and sentenced to a concurrent term of 16-months-to-four-years. He was paroled after two years, but had his parole revoked multiple times. While still on parole, he was arrested for illegal possession of a taser and a quantity of ammunition and was convicted of a weapons offense. At age 22, he was arrested for selling drugs and sentenced to another nine months in prison. He was convicted of other offenses during this same time period, including criminal mischief and attempted burglary. And throughout this period, the defendant was given opportunities to turn his life around. His time on parole involved mental health treatment, vocational training, and anger management courses. The defendant failed to take advantage of these, though, and instead decided to devote himself to a life of crime with the Latin Kings.

The defendant's conduct while incarcerated in this case also calls into question whether any sentence can deter the defendant from committing crimes. The defendant has committed multiple disciplinary infractions, including for possessing contraband. One such piece of contraband was a cellphone which the Government seized and searched shortly before trial. This cellphone showed that the defendant has been running a lucrative drug operation from his jail cell. He has been arranging drug sales on the street and then receiving the proceeds via Cashapp. The cellphone also showed videos of the defendant with a large bag of what appeared to be marijuana in his prison cell, indicating that the defendant has also been distributing drugs in jail. The defendant has clearly decided that he has no interest in a life free from crime.

A substantial sentence is also necessary to achieve the goal of general deterrence. Most Latin Kings are recruited into the gang at a young age, as "Pee Wees," when they are seduced by the prospect of easy money and the camaraderie of the gang. The defendant has used his social media accounts to advertise for the gang and promote its violence. He posts videos bragging about violence and waving firearms. He is also a walking billboard for the gang. His body is covered with tattoos advertising his affiliation with the gang, including Latin King phrases such as "554," "K" with wings and a crown, and "KGB," which stands for "Kings Getting Busy." The larger Latin Kings community will know that the defendant—whose violence and drug dealing was

constantly put forward as an example for other Latin Kings—is now serving a term of life imprisonment because of these same actions. A strong message needs to be sent to members of the Black Mob, and to young people everywhere, that the gang lifestyle is not glamorous and cool; it is instead a path that results in serious consequences, including a lifetime spent in jail.

*Finally*, a sentence of life imprisonment also reflects the defendant's relative culpability with similarly situated individuals. A term of life imprisonment is certainly not unusual for a murderer. Moreover, a sentence of life is appropriate in comparison to his co-defendants in this case. Recognizing the harm that the Black Mob imposed on the community, the Court has sentenced defendants in this case to terms of imprisonment of up to 27 years. Absent the murder, the Government would view the defendant as similarly situated to leaders such as Emmanuel Bonafe (who received a sentence of 18 years), Raul Cuello (who received a sentence of 14 years), and Paul Cuello (who received a sentence of 14 years), each of whom held a Crown position but were not at the very top of the leadership structure, and each of whom committed violence and sold drugs. The defendant has a more serious criminal history than each of these defendants, however, and is not dissimilar to defendants Angel Lopez and Mark Woods, who were both career offenders and who were sentenced to 20 years' imprisonment and 19 years' imprisonment respectively. But the defendant stands apart from all his other co-defendants, because he is the only individual charged in this case to have committed a murder. Like many of his co-defendants, the defendant was a leader in the gang, committed violence for the gang, sold drugs for the gang, and carried guns for the gang—but he alone also committed a murder for the gang. The murder increases his relative culpability and makes a sentence of life imprisonment an appropriate one, regardless of the statutory mandatory term of life imprisonment.

In sum, a sentence of life imprisonment would balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

**IV.     Conclusion**

       For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant of life imprisonment, followed by a consecutive seven years, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

By:      /s/_____
         Adam S. Hobson
         David J. Robles
         Patrick Moroney
         Assistant United States Attorneys

cc: Mark DeMarco, Esq. (by ECF)
    Ezra Spilke, Esq. (by ECF)